## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Sok Kong, Trustee for Next-of-Kin of Map Kong, Decedent,<br><br>　　　　Plaintiff,<br><br>v.<br><br>City of Burnsville; Maksim Yakovlev, in his individual and official capacity; John Mott, in his individual and official capacity; and Taylor Jacobs, in his individual and official capacity,<br><br>　　　　Defendants. | Case No. 16-cv-03634 (SRN/HB)<br><br><br><br>**MEMORANDUM OPINION AND ORDER** |

Richard E. Student and Steven J. Meshbesher, Meshbesher & Associates, P.A., 10 South Fifth Street, Suite 225, Minneapolis, MN 55402 for Plaintiff.

Patrick C. Collins and Joseph E. Flynn, Jardine Logan & O'Brien PLLP, 8519 Eagle Point Boulevard, Suite 100, Lake Elmo, MN 55042 for Defendants.

SUSAN RICHARD NELSON, United States District Judge

A little before 6:30 AM, on Thursday, March 17, 2016, Burnsville city police officers encountered a 38-year-old man named Map Kong in the parking lot of a local McDonalds. Mr. Kong was seated in his Pontiac hatchback, high on methamphetamines, shaking erratically, and, most distressingly, waving around a large knife. Around seven minutes later, three of the officers shot and killed Mr. Kong. What happened during those seven minutes was captured on video, and prompted this litigation.

Mr. Kong's family, Plaintiff here, contends that the video evidence shows police officers unreasonably using deadly force against a confused man in the midst of a mental health crisis, in contravention of the Fourth Amendment, as well as committing violations of the Fourteenth Amendment and Minnesota state negligence law. The City of Burnsville and the three officers who shot Mr. Kong, Defendants here, disagree. They argue that the video evidence shows police officers reasonably responding to a dangerous man on the verge of injuring nearby civilians.

The Court is now tasked with deciding whether to grant Defendants' summary judgment motion, in which Defendants argue that, given the video evidence and the generous protections afforded by federal and state immunity doctrines, the Court should rule in their favor as a matter of law. Plaintiff vigorously opposes the motion, arguing that, when the video evidence is construed in Mr. Kong's favor, as it must be, qualified immunity cannot be determined as a matter of law, and the case must therefore go before a jury.

For the following reasons, the Court will grant in part and deny in part Defendants' motion. Specifically, the Court grants Defendants' motion with respect to Plaintiff's Fourteenth Amendment medical indifference claim, but denies Defendants' motion with respect to Plaintiff's Fourth Amendment excessive force claim and Plaintiff's state law negligence claim.

## I.    BACKGROUND

In relaying the facts of this contentious case, the Court relies on three key principles. First, because excessive force claims are "judged from the perspective of the reasonable officer on the scene, rather than with 20/20 vision of hindsight," the Court must focus on only

the information the defendant officers had available to them in the moments leading up to the shooting. *Graham v. Connor*, 490 U.S. 386, 396 (1989); *accord Tatum v. Robinson*, 858 F.3d 544, 549 (8th Cir. 2017). Second, because this case is in a summary judgment posture, the Court must "not resolve genuine disputes of fact in favor of" Defendants, and it "must view the evidence in the light most favorable to" Plaintiff, including by drawing all "reasonable inferences . . . in [Plaintiff's] favor." *Tolan v. Cotton*, 572 U.S. 650, 656-57, 660 (2014) (per curiam); *accord Wealot v. Brooks*, 865 F.3d 1119, 1125 (8th Cir. 2017). Third, although the Court need not accept Plaintiff's version of events to the extent it is "blatantly contradicted" by video evidence, *Scott v. Harris*, 550 U.S. 372, 380 (2007), "inconclusive" video evidence must still be construed in Plaintiff's favor, *Raines v. Counseling Assocs., Inc.*, 883 F.3d 1071, 1074-75 (8th Cir. 2018); *accord Thompson v. City of Monticello*, 894 F.3d 993, 998-99 (8th Cir. 2018).

### A. Factual Description of the Shooting

This is the rare officer-involved shooting case in which the entire incident is captured on the four present officers' body cameras. As such, in describing the shooting, the Court relies principally on video evidence. The Court will supplement its description of this footage with facts gleaned from the officers' post-shooting Minnesota Bureau of Criminal Apprehension (BCA) interviews as well as various deposition testimony.

Because Officer John Mott's body camera appears to best capture the entirety of the incident, the Court will generally cite to that footage. (*See* Defs.' Ex. H [Doc. No. 38-6] ("Mott Body Camera").) Still, because each of the officers' body cameras offers a unique and important perspective, the Court will cite to other footage when necessary. (*See* Defs.' Ex. J

[Doc. No. 38-8] ("Jacobs Body Camera"); Defs.' Ex. N [Doc. No. 38-10] ("Tonne Body Camera"); Defs.' Ex. Q [Doc. No. 38-12] ("Yakovlev Body Camera").)

For ease of understanding, the Court will break down the shooting into four discrete segments: (1) the officers' initial encounter with Mr. Kong; (2) the officers' decision to break Mr. Kong's car windows after their commanding officer, Sergeant Maksim Yakovlev, arrived; (3) the officers' use of a taser on Mr. Kong; and (4) the officers' use of deadly force on Mr. Kong. At the outset, though, the Court again emphasizes that most of the events described below took place over the course of only seven minutes.

### 1. The Officers Encounter Mr. Kong in His Car After Receiving a 9-1-1 Call and Consider Their Options

At 6:16 AM, on Thursday, March 17, 2016, a customer at the Burnsville McDonalds near State Highway 13 called 9-1-1. (*See* Defs.' Ex. G [Doc. No. 38-5] ("Incident Recall Report").) The customer calmly told the operator that the police "should send a car down" because "a guy" was "jumpin' back and forth" inside his car in the parking lot, and had a "knife in his hand" that "he's been waving back and forth." (Defs.' Ex. D [Doc. No. 38-3] ("9-1-1 Call Transcript"); *see also* Defs.' Ex. C [Doc. No. 38-2] (audio recording of call).) The customer then clarified that the car was not running, and that the man had been "carrying on" like this for at least a half an hour. (9-1-1 Call Transcript at 2.) The customer also noted that he was not sure if somebody else was in the car. (*Id.* at 1.)

A dispatcher simultaneously relayed to police officers in the area that "suspicious" activity was occurring at the Burnsville McDonalds off Highway 13. (Defs.' Ex. F [Doc. No. 38-5] at 1 ("Transcript of Police Department Radio Traffic"); *see also* Defs.' Ex. E [Doc. No.

38-4] at 00:10-00:30 ("Audio Radio Traffic").) Namely, "a male in the vehicle in the lot who is jumping up and down inside his car . . . unknown if he is alone . . . he may be waving a knife back and forth inside the car." (*Id.*) Shortly thereafter, the dispatcher added that the "vehicle ha[d] been there for more than half an hour," and that an employee had seen the knife. (*Id.* at 2:09 to 2:18.) The officers did not receive information that the "suspicious" individual had directly threatened anyone at the McDonalds, or that he had committed a crime.[1]

In response to this dispatch, Burnsville city police officers John Mott and Taylor Jacobs arrived in separate vehicles at the McDonalds parking lot around 6:22 AM. (*See* Incident Recall Rep.) Officer Mott had been a police officer for around eight years. (Defs.'

---

[1]     For the sake of thoroughness, the Court notes four more preliminary facts it gleaned from the record. First, the "suspicious" individual's name was Map Kong, a 38-year-old Cambodian-American male residing in Chaska, Minnesota. (*See* Defs.' Ex. EE [Doc. No. 41] ("Hennepin County Medical Examiner's HCME Report").) Second, Mr. Kong had a history of intermittent mental health and substance abuse issues. (*See* Defs' Ex. T [Doc. No. 40] at 4-5 ("Expert Report of Dr. Stacy Hail").) Third, according to an interview with Mr. Kong's neighbor, Mr. Kong came over to the neighbor's home around 10:00 PM the night before the shooting, acting "crazy" and claiming that "he was being followed by a female who was trying to hurt him." (*See* Defs.' Ex. NN [Doc. No. 38-18] at 3-4 ("Dakota County Memorandum on Kong Shooting").) Because the neighbor "had never seen Mr. Kong behave this way," he offered to take him to the hospital. (*Id.*) Instead, however, Mr. Kong acted "scared and fled the residence," not wearing socks or shoes. (*Id.*) Fourth, according to security camera footage, Mr. Kong parked in the McDonalds lot around 1:00 AM, after having gone through the drive-thru. (*See* Defs.' Ex. W [Doc. No. 38-16] at 19 ("Expert Report of Forensic Video Solutions").) There is no evidence that Mr. Kong left his car at any point from then until the moments before his death.

         However, because this information was not available to the officers at the time of the shooting, the Court will not rely on it in evaluating the reasonableness of Defendants' actions.

Ex. L [Doc. No. 38-9] at 8 ("Mott Deposition").)[2] Further, because Officer Mott had taken a "40-hour week long crisis intervention training" course five years prior, the City considered him a "Crisis Intervention Training (CIT) member." (*Id.* at 30, 70-71.) Per the Burnsville Police Department's "Crisis Intervention Policy" (also known as Policy No. 423, or CIT Policy), a CIT member should be the lead officer when dealing with someone "who may be experiencing a mental health or emotional crisis,"[3] and should attempt to follow the "de-escalation" steps outlined by the policy, with the goal of "resolv[ing] the incident by the safest and least confrontational means possible." (Defs.' Ex. RR [Doc. No. 38-19] at 2 ("CIT Policy").) These steps include requesting backup officers and specialized resources, turning off flashing lights, acknowledging a person's potential inability to understand commands, securing the scene and clearing the immediate area, and, if possible, "passively monitoring the situation" and/or using alternatives to force. (*Id.*) Officer Jacobs had been a police officer for four years, and, although he was not a CIT member, he was familiar with the Burnsville police department's CIT policy. (*See* Defs.' Ex. M [Doc. No. 38-9] at 6, 37-38 ("Jacobs Deposition").)

Upon parking, Officer Jacobs took down Mr. Kong's license plate number, but did not request any further information connected to the license plate number. (*See* Defs.' Ex. J [Doc. No. 38-8] at 0:40-0:44 ("Jacobs Body Camera"); *see also* Jacobs Dep. at 9 (stating that,

---

[2]     All deposition and interview citations are to the deposition or interview page number, rather than the ECF page number.

[3]     Signs that a person may be in a "mental health crisis" include: "delusions or hallucinations," "manic or impulsive behavior, extreme agitation, lack of control," and "lack of fear." (CIT Policy at 1-2.)

although he could have asked dispatch for additional information connected to a license plate, he did not do so in this case).) Then, because the sun had not yet risen, Officers Jacobs and Mott approached Mr. Kong's blue Pontiac hatchback with flashlights (and firearms) drawn. (*See* Mott Body Camera at 1:20-1:25.)[4]

In the body camera footage, one can see steady weekday morning traffic in the background, both on the Frontage Road directly abutting the McDonalds, and, more particularly, on Highway 13, which lay a short distance from the parking lot. (*See, e.g.*, *id.* at 00:50-1:00.) Further, over the course of this encounter, one can see cars turning into the McDonalds parking lot en route to the drive-thru. (*See* Defs.' Ex. W [Doc. No. 38-16] at 19 ("Expert Report of Forensic Video Solutions") (noting that, over the course of the incident, 13 civilian vehicles moved in and out of the parking lot).) However, one cannot see any pedestrians walking around, possibly because of the early morning hour and the fact that the surrounding properties are all commercial/industrial in nature. (*See* Defs.' Br. in Support of Summ. J. ("Defs.' Br.") [Doc. No. 37] at 5 (displaying screenshot of area from Google Maps, which the Court replicates below).)

---

[4]     Both of the officers' body cameras were on from the moment they arrived.



When Officers Mott and Jacobs reached the vehicle, they encountered a very agitated Mr. Kong. Specifically, Mr. Kong was seated in the drivers' seat with the windows rolled up, and he was rocking back and forth while slashing a large knife through the air in front of him, as if he was fighting an invisible person. (*See, e.g.*, Mott Body Camera at 1:40-1:45.) In an interview taken hours after the incident, Officer Mott aptly described Mr. Kong's motions as "frantic" and "abnormal." (Defs.' Ex. JJ [Doc. No. 38-18] at 7 ("Mott BCA Interview"); *see also* Defs.' Ex. KK [Doc. No. 38-18] at 11 ("Jacobs BCA Interview") (stating that, when he first saw Mr. Kong, he "looked like he was in some sort of distress").) At their depositions, both officers also stated that, at the time, they thought Mr. Kong was under the influence of methamphetamines or bath salts. (*See* Mott Dep. at 21; Jacobs Dep. at 10.) Nonetheless, both

officers also contended at their depositions that, at the time, they did not believe this was a "mental health situation," in which the aforementioned CIT policy would apply. (*See* Mott Dep. at 21, 64-70, 72-73; Jacobs Dep. at 14, 25-26, 38.)

With their firearms and flashlights pointed directly at Mr. Kong, the officers immediately (and repeatedly) began yelling at Mr. Kong to "drop the knife" and show his hands, but to no avail. (*See* Mott Body Camera at 1:20-2:10.) Officer Jacobs also informed Mr. Kong that he was under arrest. (*Id*. at 1:34.) Although Officer Jacobs did not tell Mr. Kong what he was under arrest for at the time, at his deposition Officer Jacobs clarified that he could have arrested Mr. Kong for "disorderly conduct, threats of violence . . . obstruction." (Jacobs Dep. at 10; *see also* Defs.' Br. at 23 (providing statutory citations).)[5]

About 30 seconds after Officers Mott and Jacob first approached Mr. Kong, a third Burnsville city police officer, Officer Lynrae Tonne, arrived. (*See* Mott Body Camera at 2:10 (car pulling up), 2:40 (joining officers).) Officer Tonne had been a police officer for around 18 years, and, like Officers Jacobs, was familiar with the CIT policy, but not a CIT team member. (*See* Defs.' Ex. P [Doc. No. 38-11] at 6, 30 ("Tonne Deposition"); Defs.' Ex. LL [Doc. No. 38-18] at 3 ("Tonne BCA Interview").) At Officer Mott's direction, Officer Tonne parked her squad car immediately in front of Mr. Kong's vehicle. (*See* Mott Body Camera at 2:10-2:12.)

---

[5]    Specifically, Officers Mott and Jacobs believed Mr. Kong had committed (or was committing) felony terroristic threats (Minn. Stat. § 609.713), gross misdemeanor obstruction of justice (Minn. Stat. § 609.50), and misdemeanor disorderly conduct (Minn. Stat. § 609.72).

Because verbal commands and pointed handguns were not causing Mr. Kong to drop the knife (or having any effect on him at all), the three officers began discussing alternative options. In between continued shouts of "drop the knife!", Officer Mott suggested "bust[ing] a window" and "tas[ing] him," to which Officer Jacobs said, "we can hold off a little bit here, but we can bust the window and tase him if you want." (Mott Body Camera at 2:30-2:48.) "If he gets out," Officer Jacobs added, "I'll go lethal." (*See id.* at 2:48-2:50; Jacobs Dep. at 11 (explaining that, to police, "go lethal" means having one's handgun out and ready to fire).) The officers then contemplated how best to surround Mr. Kong's car so as to taser him without risking "cross fire," which prompted Officer Mott to comment, "this is going to go badly either way." (Mott Body Camera at 3:22.) At one point, Officer Jacobs observed that Mr. Kong might have a gun in the car, too. (*Id.* at 4:56.)

Still, for roughly another three minutes, the officers did not take further action against Mr. Kong. Instead, they held their ground around the car and watched Mr. Kong occasionally burst into frantic fits of gyrations and knife waving, as he had been doing since the officers arrived. (*See generally id.* at 3:20-6:20.) At no point did Mr. Kong attempt to exit the car or engage with the officers. Perhaps because of this, Officer Tonne stated, "he's contained for now, so let's just wait until other people get here." (*Id.* at 4:10-4:16.) However, the officers did not discuss this "containment" option, or any other tactical decisions, at length.

Moreover, during this three-minute pause Officer Jacob called for a "stage medic" and then moved his squad car behind Mr. Kong's vehicle, so that Officer Tonne's car and his car would block Mr. Kong in from the front and back. (*Id.* at 5:40; *see also* Jacobs Body Camera at 3:54; Audio Radio Traffic at 10:04.) Although there was no discussion at the time as to

why Officers Jacobs called for a medic, at his deposition Officer Jacobs stated that "staging medics [at the scene] is something I commonly do . . . if I see somebody that's under the influence of what I believe to be methamphetamines." (Jacobs Dep. at 15-16.) He also expressed concern about "a potential victim in the car." (*Id.*)[6]

Around the same time, Officer Mott requested that any additional units "completely block off traffic coming into the McDonalds parking lot." (Mott Body Camera at 5:50-5:54; Audio Radio Traffic at 11:24.) However, neither officer appeared to confirm when medics and/or additional units would arrive.

### 2. After Sergeant Yakovlev Arrives, the Officers Decide to Break Two of Mr. Kong's Car Windows to See If Anyone Else Is Inside

This momentary lull in activity concluded when Sergeant Maksim Yakovlev arrived on the scene. (*See* Tonne Body Camera at 3:50; *see also* Incident Recall Rep. (noting that Sergeant Yakovlev ("Stat BV/45S39") arrived at 6:30 AM).) Sergeant Yakovlev had been a police officer for 13 years, including a sergeant for four of those years, and was familiar with the department's CIT policy. (*See* Defs.' Ex. S [Doc. No. 38-13] at 6-7, 30 ("Yakovlev Deposition").)

After parking his brightly-lit squad car at the Frontage Road entrance to the McDonalds (albeit without completely blocking off the entrance), Sergeant Yakovlev

---

[6]     Although Officer Jacobs did not inform the dispatcher of any mental health concerns, the dispatcher who conveyed Officer Jacobs's request to the medic treated the situation as a "possible psych hold." In other words, she thought Mr. Kong's "behaviors would indicate the medics are being requested because of possible psycho[logical] issues," based on the 9-1-1 call notes she had in front of her. (Pl.'s Ex. C [Doc. No. 49-3] at 7, 11-12 ("Kristeen Kennedy Deposition").)

approached his fellow officers and asked whether Mr. Kong was "cutting himself or what," to which Officers Jacobs replied "no, he's just swinging the knife around." (Jacobs Body Camera at 5:40-5:45.) Officer Jacobs then assessed the situation for Sergeant Yakovlev: "So, our options so far, he's contained, we can bust the window and pop him with a Taser, 'cause if he hops out of that car . . . ." (*Id.* at 5:45-5:55.) Officer Mott added that, while it looked as though Mr. Kong was by himself, they could not see the backseat. (*Id.* at 6:03-6:05.)

In response, Sergeant Yakovlev suggested that the officers "figure out if he's by himself there first." (Yakovlev Body Camera at 1:55-2:00.) After circling around toward the passenger side of Mr. Kong's car (the side of the car farther away from Frontage Road), and finding those windows just as fogged up as the ones on the drivers' side, Sergeant Yakovlev and Officer Mott instructed Officer Jacobs to "bust out [Mr. Kong's] back window" with his baton, while still "watch[ing] the cross-fire." (*Id.* at 2:30-2:30.)

As the officers surrounded the Pontiac even more closely, Mr. Kong continued to frantically gyrate back and forth in his seat, knife in hand. (*See* Mott Body Camera at 7:00-7:20.) The officers did not discuss what they would do if Mr. Kong was, in fact, alone in his vehicle, or what they would do if Mr. Kong "hopped out of the car," as Officer Jacobs had alluded to a moment earlier. Rather, as Officers Jacobs began swinging his baton into Mr. Kong's car window, the three other officers stood in an L-shaped formation around the car, guns aimed at Mr. Kong.[7]

---

[7]     After the fact, Officer Mott explained the officers' strategy as follows: "Our game plan was to get him to drop the knife and come out of the vehicle with no weapons in his hands so we could figure out what the deal was and so he wasn't presenting a threat to all the people that were around us." (Mott. Dep. at 48-49.)  "As long as he [was] in that car

### 3. The Officers Twice Taser Mr. Kong, Who Is Still Sitting Inside His Car

At this point, everything began to move very quickly. Immediately after Officer Jacobs successfully smashed Mr. Kong's passenger-side windows, Officers Tonne and Mott again began yelling at Mr. Kong to "drop the knife!" (*See* Mott Body Camera at 7:40-7:45.) At the same time, and without further discussion, Officer Jacobs exclaimed "taser, taser," and fired his taser at Mr. Kong. (*Id.* at 7:45; *see also* Jacobs Dep. at 22, 39 (asserting that "taser, taser" functioned as a warning for both Mr. Kong and his fellow officers).) Although Mr. Kong made various high-pitched, distressed squealing noises in response to this activity, the taser did not cause him to either drop his knife or cease bouncing up and down in his seat. (*See, e.g.*, Mott Body Camera at 7:42, 7:55.) Further, although Mr. Kong had not moved to exit his vehicle at this point, Sergeant Yakovlev, standing near the front of the car, closest to Mr. Kong, repeatedly said "he's coming out" and readied his firearm. (*See* Yakovlev Body Camera at 2:56-2:58; *see also* Forensic Video Analysis Ex. Rep. at 17 (noting that Sergeant Yakovlev stood about ten feet from Mr. Kong's car).)

About ten seconds later, as Officer Jacobs prepared to fire a second taser round at Mr. Kong (presumably because the first one did not have the desired effect), Mr. Kong swung his knife closer to the broken passenger-side window. Mr. Kong then fell back in his seat as the second taser shot hit him. (*See* Mott Body Camera at 8:03-8:07; Tonne Body Camera at 5:38-5:40; *see also* Defs.' June 1, 2018 Letter [Doc. No. 56] (providing further detail on this point).)

---

we [were] not going to be able to make the situation safe," Officer Mott emphasized. (*Id.*) Officer Mott also stated that, given the presence of civilians in the area, breaking the car window and deploying a taser presented "the fastest, safest way to try to come to a good resolution of this." (*Id.* at 52.)

Defendants describe this moment as an "assault" on Officer Jacobs, in which Mr. Kong "violently swung and lunged his large knife out of the broken passenger side window at [Officer] Jacobs." (Defs' Br. at 13; *see also id.* at 23 (citing Minn. Stat. § 609.221, subd. 2 (first degree felony assault on a police officer).) Plaintiff, by contrast, interprets Mr. Kong's motion as part and parcel of the "the erratic arm motions he had been making prior to the taser deployment," or, "at most," a defensive reaction "to the taser cartridge and/or wire at the moment the taser is deployed for a second time." (*See* Pl.'s Br. in Opp'n to Defs.' Summ. J. Mot. [Doc. No. 48] at 10 ("Pl.'s Br."))

### 4. The Officers Shoot and Kill Mr. Kong as He Attempts to Flee His Car

In either event, right after the second taser round hit Mr. Kong, Mr. Kong stumbled out of the driver-side door and fell to the pavement. (*See* Yakovlev Body Camera at 3:15; Mott Body Camera at 8:06-8:08.) However, he quickly stood up, knife in hand, and began running north toward Frontage Road, away from the officers and away from the McDonalds. (*See* Yakovlev Body Camera at 3:16-3:21; Mott Body Camera at 8:09-8:12.) One onlooker from inside the restaurant, a McDonalds employee named Guadalupe Sandoval, stated that, when Mr. Kong fled his car, he looked "scared." (*See* Defs.' Ex. Y [Doc. No. 38-17] at 14 ("Sandoval Deposition") (explaining that, after the officers tased Mr. Kong, "he opened the door scared and ran").)[8]

---

[8]     Ms. Sandoval also recorded a cellphone video of the final seconds of the shooting from inside the restaurant. (*See* Defs.' Ex. V [Doc. No. 38-15] ("Sandoval Cell Phone Video").) However, in the Court's view, the body camera videos provide a far clearer visual of the shooting.

Then, without further discussion or warnings, Officers Mott, Jacobs, and Yakovlev shot Mr. Kong from the back and side, ultimately firing at least 23 bullets within a span of three seconds. (*See* Dakota Cty. Mem. at 7 (number of bullets); Forensic Video Solutions Ex. Rep. at 25 (timespan).) 15 bullets hit Mr. Kong, killing him instantly. (*See* Dakota County Memorandum at 8; *see also* Mott Body Camera at 10:00-10:05 (finding no pulse upon checking Mr. Kong's body).) Officer Mott later stated that this was the first time he had discharged his weapon in the line of duty. (*See* Mott BCA Interview at 14.) [9]

At the time of the shooting, the video evidence shows a tan civilian vehicle exiting the McDonalds, driven by a woman named Patricia Unterschuetz, around 30 feet northwest of Mr. Kong. (*See* Forensic Video Solutions Ex. Rep. at 17-18; Yakovlev Body Camera at 3:11-3:13.) Indeed, one of the officer's bullets lodged into Ms. Underschuetz's back bumper as she pulled out of the parking lot. (*See* Defs.' Ex. BB [Doc. No. 38-17] ("Pictures of Bullet in Ms. Unterschuetz's Vehicle"); Defs.' Ex. X [Doc. No. 38-17] at 20-23 ("Unterschuetz Deposition") (explaining that she did not realize a bullet hit her car until later that day).) Moreover, steady traffic on Highway 13 is visible in the background, as are a few cars driving along Frontage Road. (*See, e.g.*, Mott Body Camera at 8:12-8:20; Tonne Body Camera 5:55-6:05.)

However, apart from the officers and the McDonalds' customers and employees in the store, all of whom Mr. Kong was moving away from at the time of his death, no pedestrians

---

[9]     Although Officer Tonne did not fire her weapon, she has consistently stated that she only did so because she was not in a good shooting position, and that her fellow officers were justified in using deadly force against Mr. Kong. (*See, e.g.*, Tonne Dep. at 15.)

are visible in the video. (*Accord* Mott Dep. at 38 (confirming that, at the time of the incident, he did not recall Mr. Kong running toward "any pedestrians not in vehicles").) Further, although Defendants argue that Officer Mott and Tonne's body cameras show Mr. Kong "sprinting toward [Ms.] Unterschuetz with a long knife in his right hand," (Defs.' Letter June 1, 2018 Letter at 2), when one views the videos in the light most favorable to Plaintiff, it appears that Mr. Kong is simply running in the direction of Frontage Road, and away from the officers tasing him, rather than at Ms. Underschuetz's vehicle in particular. (*See, e.g.*, Mott Body Camera at 8:10.)

Still, in both their BCA interviews and depositions, all four officers contended that when Mr. Kong ran from his car, knife in hand, he posed an imminent threat of "great bodily harm or death" to both themselves and the surrounding public. (*See* Defs.' Br. at 17 (collecting record citations).) For instance, Officer Mott stated that, even if Mr. Kong was not poised to attack any one person or car, deadly force was justified because "there was cars constantly coming and going," including "traffic just basically across the parking lot on Highway 13." (Mott Dep. at 37; *see also* Yakovlev Dep. at 21 (stating that, regardless of Mr. Kong's intent, Mr. Kong had the "opportunity and means" to harm "people that are on Highway 13 and the Frontage Road and in that general area, including my officers").) More specifically, Sergeant Yakovlev worried that, "if [Mr. Kong] would've got close enough to that traffic, then he could either carjack a car or stab somebody or run in the traffic and get hit himself." (Defs.' Ex. MM [Doc. No. 38-18] at 20 ("Yakovlev BCA Interview").)[10]

---

[10]     At oral argument, Defendants' counsel amplified this fear: "COURT: And what risk did Mr. Kong pose to [civilians] with a knife if they are in a vehicle? COUNSEL: He

Ms. Sandoval, the aforementioned McDonalds employee, and Kimberly Starinskis, a McDonalds drive-thru customer who exited the premise seconds before the shooting, also said that, at the time, they feared for the safety of everyone around Mr. Kong. (*See* Sandoval Dep. at 15, 19; Defs. Ex. HH [Doc. No. 38-18] at 23-24 ("Starinskis Deposition").)[11]

### 5. The Aftermath

Almost immediately after the officers shot Mr. Kong another Burnsville police officer, detective Sergeant Gast, arrived on the scene, followed by three more police officers in the ensuing minutes. (*See generally* Yakovlev Body Camera at 3:40-10:00; Yakovlev Dep. at 12-14; Incident Recall Rep. (showing that Sergeant Gast arrived at 6:31 AM, followed by other officers at 6:34, 6:38, and 6:46 ).) Some of these officers were from the neighboring Savage, Minnesota police department, which Sergeant Yakovlev had radioed for assistance after Mr. Kong's death. (*Id.*)[12]

---

could easily have opened the door and stabbed them. He could highjack them. We have carjackings that happen all the time." (May 25, 2018 Hr'g Tr. at 12-13.)

[11]     Although, in fairness, Ms. Sandoval also said she felt fear "because [the police] shot [Mr. Kong] and [she] had never seen anyone die in front of [her]." (Sandoval Dep. at 15.) And Ms. Starinskis admitted that her fear stemmed from seeing Mr. Kong's movements in his car as she drove by, rather than from Mr. Kong's dash from his car. (Starinskis Dep. at 34-35.)

[12]     Although Sergeant Yakovlev attests that no other officers were available from the Burnsville Police Department the morning of March 17, (*see* Defs.' Ex. SS [Doc. No. 38-20] at 2-3 ("Affidavit of Sergeant Maksim Yakovlev")), it is not clear why the officers did not try to call upon other departments, like the Savage Police Department, prior to breaking into Mr. Kong's vehicle (*See* Yakovlev Dep. at 12-14 (stating that "we can request help from . . . Savage, Minnesota State Patrol, Eagan Police Department, Apple Valley Police Department, Bloomington").)

Medics arrived about five minutes after the shooting, at 6:35 AM, and carried away Mr. Kong's body. (*See* Yakovlev Body Camera at 9:44; Incident Recall Rep.) A post-mortem toxicology test confirmed that Mr. Kong was under the influence of amphetamines and methamphetamines at the time of his death. (*See* Dakota Cty. Mem. at 8.)

Per County policy, the Dakota County Attorney's office empaneled a grand jury to consider filing criminal charges against Officers Jacobs, Mott, and Yakovlev. (*See* Defs.' Ex. NN [Doc. No. 38-18] ("Dakota County Press Release").) However, on June 21, 2016, the County Attorney announced that the grand jury had concluded that the officers' use of deadly force was justified under Minnesota law. (*Id.*)

## B. Procedural History

### 1. Claims and Defenses at Issue

A few months later, on October 26, 2016, the court-appointed trustee for Mr. Kong's next-of-kin, which include Mr. Kong's "two sons, his parents, and his nine siblings," filed this lawsuit. (*See* Compl. [Doc. No. 1] ¶ 4.) In it, the trustee (hereinafter "Plaintiff") asserted Section 1983 claims against Officers Mott, Jacobs, and Yakovlev (hereinafter "Defendants") for (1) use of excessive force against Mr. Kong, in violation of the Fourth Amendment and (2) deliberate indifference to Mr. Kong's objectively serious medical needs, in violation of the Fourteenth Amendment. Plaintiff also asserted a state law negligence claim against Defendants for failing to adhere to various Burnsville Police Department policies during their encounter with Mr. Kong, particularly the aforementioned CIT Policy. (*Id.* ¶ 55.)[13]

---

[13]     Although Plaintiff also asserted claims against the City of Burnsville for "failure to train" and for direct municipal negligence, Plaintiff later agreed to dismiss those

Defendants jointly answered on December 2, 2016. (*See* Answer [Doc. No. 10].) In their Answer, Defendants asserted various defenses, including qualified immunity. (*See id.* ¶¶ 57-59.)

### 2. Dueling Expert Reports Produced During Discovery

During discovery, both sides produced expert witness reports, in addition to the depositions and video evidence described above.

Defendants produced four expert reports. First, Forensic Video Solutions provided more detailed factual information concerning the distance between various people and objects in the McDonalds' parking lot, the limitations of body cameras, and the timing of the officers' gunshots. (*See* Forensic Video Solutions Ex. Rep.) Second, Dr. Stacy Hail, an emergency medical physician and medical toxicologist, opined that law enforcement officers would not be expected to know the difference between methamphetamine intoxication and acute psychosis due to mental illness, and that medics could not have assisted Mr. Kong at the time of his death because Mr. Kong presented "a danger to himself and others" and the scene was not secure. (*See* Defs.' Ex. T [Doc. No. 40] at 15 ("Dr. Hail Expert Report").) Third, Steven Wickelgren, the Clinical Director of Minnesota's CIT Officers' Association, opined that, given Mr. Kong's "uncertain" and "unpredictable" behavior, the officers "acted safely and used appropriate de-escalation and CIT tactics." (*See* Defs.' Ex. II [Doc. No. 38-18] at ECF 20 ("Wicklgren Expert Report").) Fourth, Stuart Robinson, a law enforcement expert, opined

---

claims. (*See* Mar. 13, 2018 Stipulation for Dismissal [Doc. No. 32].) However, Plaintiff still seeks to hold the City of Burnsville vicariously liable under the remaining negligence claim. (*Id.*) For ease of reference, though, the Court will continue to refer to the three officer Defendants as "Defendants."

that the officers' use of deadly force was proper, and consistent with "accepted law enforcement standards" and "commonly instructed law enforcement training and practice." (*See* Defs.' Ex. OO [Doc. No. 38-18] at 3 ("Robinson Expert Report").)

For their part, Plaintiff produced two expert reports. First, D.P. Van Blaricom, a law enforcement expert, opined that the officers "failed to make a reasonable approach to [Mr. Kong], who was demonstrably experiencing a psychotic episode," and that it was "objectively unreasonable" to "fatally shoot" Mr. Kong under the circumstances. (*See* Pl.'s Ex. A [Doc. No. 49-1] at 13, 17 ("Blaricom Expert Report").) Second, Dr. James Alsdurf, a psychologist, opined that, at the time of his death, Mr. Kong was exhibiting "such disorganized thinking and feeling" that his actions "offered an objective need for medical attention." (*See* Pl.'s Ex. B [Doc. No. 49-2] at 4 ("Alsdurf Expert Report").)

### 3. Defendants Move for Summary Judgment

Following discovery, on April 13, 2018, Defendants moved for summary judgment on all three of Plaintiff's claims. Specifically, Defendants contend that, as a matter of law, "there were no Fourth or Fourteenth Amendment violations, the Officers are entitled to qualified immunity," and, with respect to the negligence claim, "the Defendants are entitled to official and vicarious official immunity." (Defs.' Br. at 3.) Plaintiff filed an opposition brief on May 4 (*see* Pl.'s Br.), and Defendants replied on May 11 (*see* Defs.'s Reply Br. [Doc. No. 50]). The Court heard oral argument on May 25. Shortly thereafter, Defendants submitted a letter further elaborating on certain aspects of the body camera evidence, and Plaintiff responded. (*See* Defs.' June 1, 2018 Letter; Pl.'s June 4, 2018 Letter [Doc. No. 57].)

## II. DISCUSSION

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the Court noted above, in reviewing Defendant's motion for summary judgment, the Court must "not resolve genuine disputes of fact in favor of" Defendants, and it "must view the evidence in the light most favorable to" Plaintiff, including by drawing all "reasonable inferences . . . in [Plaintiff's] favor." *Tolan*, 572 U.S. at 656-57, 660. As the Eighth Circuit recently re-affirmed, this principle holds equally true in officer-involved shooting cases captured on video. *See Raines*, 883 F.3d at 1074-75 (finding a genuine factual dispute existed where "the video evidence" was "inconclusive as to whether or not [the knife-wielding plaintiff] advanced on the officers in a manner that posed a threat of serious physical harm to an officer").

With this standard in mind, the Court addresses each of Plaintiff's claims in turn.

## A. Plaintiff's Section 1983 Claims

### 1. Qualified Immunity

Two of Plaintiff's claims – their Fourth Amendment claim and their Fourteenth Amendment claim – arise under 42 U.S.C. § 1983. Section 1983 allows plaintiffs to sue state and local government officials who allegedly violate their constitutional rights for money damages. However, the defense of qualified immunity "protects government officials from incurring civil liability" under Section 1983 if the official's "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wealot*, 865 F.3d at 1124-25 (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). To determine if qualified immunity applies, a court must ask two questions: "(1)

whether the facts the plaintiff has presented, when viewed in his favor, show that the conduct of the officer violated a constitutional right, and (2) whether that constitutional right was clearly established at the time of the incident such that a reasonable officer would have known his or her actions were unlawful." *Neal v. Ficcadenti*, 895 F.3d 576, 580 (8th Cir. 2018).

Courts have discretion to decide the order in which to engage these two prongs. *See Pearson*, 555 U.S. at 236. But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment. *See Wealot*, 865 F.3d at 1124.

### 2. Excessive Force Under the Fourth Amendment

#### a. Whether There Was a Fourth Amendment Violation

##### 1. The Law

The Fourth Amendment of the U.S. Constitution protects individuals against "unreasonable searches and seizures." U.S. Const. amend. IV. Excessive force claims are "seizures" subject to the reasonableness requirement of the Fourth Amendment. *See Graham v. Connor*, 490 U.S. 386, 395 (1989). Because "reasonableness" is an objective standard, "an officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.* Rather, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.*

Considering whether a police officer acted "objectively reasonably," then, "requires balancing 'the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the subject posed an immediate threat to the

safety of the officers or to others, and [3] whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Wealot*, 865 F.3d at 1125 (citing *Graham*, 490 U.S. at 396). Further, because "[t]he intrusiveness of a seizure by means of deadly force is unmatched," *Tennessee v. Garner*, 471 U.S. 1, 9 (1985), "the use of deadly force against a fleeing suspect who does not pose a significant and immediate threat of serious injury or death to an officer or others is not permitted," *Capps v. Olson*, 780 F.3d 879, 886 (8th Cir. 2015). This distinction between using deadly force on a non-compliant subject versus other forms of force makes sense because, "even when officers are justified in using *some* force, they violate suspects' Fourth Amendment rights if they use *unreasonable* amounts of force." *Tatum v. Robinson*, 858 F.3d 544, 550 (8th Cir. 2017) (emphasis added).

However, in reviewing an officer's actions, a court must keep in mind that "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Church v. Anderson*, 898 F.3d 830, 833 (8th Cir. 2018) (quoting *Graham*, 490 U.S. at 396-97). And, as the Court noted above, courts must judge the reasonableness of an officer's use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

## 2. Analysis

The Fourth Amendment "objective reasonableness analysis must be conducted separately for each search or seizure that is alleged to be unconstitutional." *Frederick v. Motsinger*, 873 F.3d 641, 645-46 (8th Cir. 2017) (quoting *Cty. of L.A. v. Mendez*, 137 S. Ct. 1539, 1546 (2017)). Plaintiff here only argues that Defendants' use of deadly force was an

unconstitutional seizure. As such, the Court will only consider Defendants' actions in the seven minutes leading up to Mr. Kong's death, such as Defendants' decision to break Mr. Kong's car windows and taser him, insofar as it is alleged that those actions, and the information Defendants gleaned during that time period, rendered Defendants' ultimate decision to shoot and kill Mr. Kong unreasonable. *See Gardner v. Buerger*, 83 F.3d 248, 253-54 (8th Cir. 1996) (holding that, although plaintiffs "must present evidence that the seizure itself, not its prologue, was unreasonable before [they] can get to a jury with [their] § 1983 claim," evidence about the "surrounding circumstances" may be relevant to the "ultimate question" of "whether the use of deadly force was reasonable").

On this inquiry, the Court finds that, even taking into account the "tense" and "uncertain" nature of Defendants' encounter with Mr. Kong, *Church*, 898 F.3d at 833, two genuine disputes of material fact preclude the Court from deeming the officers' use of deadly force objectively reasonable as a matter of law: First, there is a material dispute as to whether Mr. Kong had committed a violent felony before the officers shot him (*i.e.*, by "assaulting" the officers), such that the officers reasonably would have thought him likely to hurt others. Second, there is a material dispute as to whether the fleeing Mr. Kong posed a significant and immediate threat of serious injury or death to the surrounding public, simply because he was holding a knife and running in the general direction of highway car traffic.[14]

---

[14] Plaintiff also disputes whether Defendants provided Mr. Kong with sufficient warnings before resorting to deadly force. *See Garner*, 471 U.S. at 11 (holding that, in deadly force cases, officers must give a suspect "some warning" before shooting, if "feasible"). However, because the Eighth Circuit has interpreted this warning requirement as being satisfied by an officer merely pointing a gun at someone holding a knife and commanding them to drop the knife, and because it is not disputed that Defendants gave

### a. Whether Mr. Kong Committed A Violent Felony Before the Shooting

In determining whether deadly force was objectively reasonable, courts may consider whether "[t]he record conclusively demonstrate[s] that [a decedent] committed [a] violent felony" before being shot. *Wallace v. City of Alexander*, 843 F.3d 763, 768 (8th Cir. 2016). In *Wallace*, for instance, a police officer claimed at her deposition that an individual committed an "aggravated assault" by pointing a gun directly at her, prior to her use of deadly force. *Id.* (citing state law that pointing a gun at someone constituted aggravated assault). However, because the officer had not said that the decedent pointed a gun directly at her in an earlier, post-shooting interview, the Eighth Circuit found that a jury could "credit [the officer's] first statements over the subsequent versions and conclude that [the decedent] had not committed a violent felony before he himself was seized with force." *Id.*; *compare with Brossart v. Janke*, 859 F.3d 616, 625 (8th Cir. 2017) (finding repeated use of a taser reasonable where "the undisputed summary judgment record" and a later state court conviction showed that the plaintiff "made two threats of violence to law enforcement officers," both of which constituted felonies under state law).

Here, Defendants argue that the video evidence and the officers' deposition testimony clearly show that the officers "had reason to believe Mr. Kong committed multiple felonies before he exited the vehicle." (Defs.' Br. at 23-24.) Specifically, Defendants argue that Mr.

---

such a warning (repeatedly) here, the Court finds no dispute of material fact on this issue. *See, e.g.*, *Loch v. City of Litchfield*, 689 F.3d 96, 967 (8th Cir. 2012).

Kong committed "felony terroristic threats" (Minn. Stat. § 609.713) and "first degree felony assault" (Minn. Stat. § 609.221, subd. 2) shortly before his death. (*Id.* at 23.)

With respect to "felony terroristic threats," Defendants argue that the video shows Mr. Kong "violently lung[ing], bang[ing], and slic[ing] his knife against the thin glass window that separated [him] from the officers in a public parking lot with many people nearby," which purportedly communicated a threat to the officers and others. (*Id.*)

With respect to "first degree felony assault," and as described above, Defendants argue that the video shows Mr. Kong "reach[ing] across the passenger seat and violently lung[ing] his long knife through the open window at [Officer] Jacobs." (*Id.*) Moreover, three of the four officers specifically mentioned this moment in their depositions, and emphasized its importance in their ultimate decision to use deadly force. (*See* Mott Dep. at 79 (stating that Mr. Kong "slashed out and tried to stab Officer Jacobs," and that, "if he's willing to do that toward a police officer it's reasonable to say he's willing to do that to someone else"); Tonne Dep. at 26 (claiming that deadly force would have been justified even if Mr. Kong was not running toward people because "he was already basically assaulting us"); Yakovlev Dep. at 36 (asserting that he did not need to give a command to shoot because "after [Mr. Kong] swiped at my officer with the knife I felt that he was a threat of deadly force to our officers and people around").

By contrast, Plaintiff argues that, for one, the officers had no reason to believe Mr. Kong was threatening anyone from within the confines of his car. (*See* Pl.'s Br. at 3-5.) Rather, Plaintiff argues, the video evidence simply shows Mr. Kong "waving his arms and moving his body in a continuous and erratic fashion," albeit while holding a knife. (*Id.* at 9.)

Moreover, with respect to the alleged assault on Officer Jacobs, Plaintiff argues that Mr. Kong "did not in fact in attempt to strike [Officer] Jacobs," and that, at worst, Mr. Kong "react[ed] defensively to the taser cartridge and/or wire at the moment the taser [was] deployed for a second time." (*Id*. at 10.) Further, Plaintiff contends that, after the alleged assault, the video shows Defendants "carry[ing] on as they had been previously." (*Id*. at 11; *see also* Blaricom Ex. Rep. ¶ 23(g) (opining that "reasonable officers responding to and evaluating this incident would not have concluded that [Mr. Kong] was threatening them," in part because Mr. Kong's reaction to Officer Jacobs's taser "was no different than the behavior he had previously been displaying").) Plaintiff also notes that, in their post-shooting BCA interviews, none of the four present officers claimed that Mr. Kong assaulted Officer Jacobs prior to their use of deadly force. (*Id*. at 10-11.)

The Court finds that, just as in *Wallace*, a material dispute of fact exists as to whether Mr. Kong committed either felony terroristic threats or first-degree felony assault in the moments before his death. *See Wallace*, 843 F.3d at 768. As relevant here, a person commits felony terroristic threats when they "threaten, directly or indirectly, to commit any crime of violence with purpose to terrorize another . . . or in a reckless disregard of the risk of causing such terror." Minn. Stat. § 609.713. "A communication constitutes a threat if, in context, it would have a reasonable tendency to create apprehension that its originator will act according to its tenor." *State v. Smith*, 825 N.W.2d 131, 135 (Minn. Ct. App. 2012). In *Smith*, for instance, the court found that a person committed felony terroristic threats when, in the midst of a heated argument, the person waved a knife at somebody four feet away from them and demanded money. *Id*.

Viewing the record in the light most favorable to Plaintiff, a reasonable juror could find that Mr. Kong did not commit felony terroristic threats. Record evidence suggests that, "in context," Mr. Kong's erratic knife waving within the confines of his car did not evince an intent to "act according to its tenor." *Smith*, 825 N.W.2d at 135. As the 9-1-1 caller (calmly) informed the police, Mr. Kong had been waving the knife around in his car, uninterrupted, for at least 30 minutes before the officers arrived. *See supra* at 4-5 (noting that Officers Jacob and Mott received this information). And, even after the officers arrived, Mr. Kong at no point attempted to communicate to, much less target, anyone outside the car.

Next, a person commits first-degree felony assault by "using or attempting to use deadly force" against a police officer performing their duties. Minn. Stat. § 609.221, subd. 2. "Deadly force" means acting with "the purpose of causing, or which the actor should reasonably know creates a substantial risk of causing, death or great bodily harm." *Id*. § 609.066, subd. 1. An officer has probable cause to believe someone assaulted them if, for instance, the person stands near the officer and makes "a quick movement toward [the officer] with knives in hand while uttering words to the effect that he wished to engage [the officer] in combat [*i.e.*, "bring it on, f*****"]." *State v. Trei*, 624 N.W.2d 595, 597-98 (Minn. Ct. App. 2001).

Viewing the record in the light most favorable to Plaintiff, a jury could find that, unlike the defendant in *Trei*, Mr. Kong did not knowingly "attempt to use deadly force" against Officer Jacobs. Minn. Stat. § 609.221, subd. 2. The video certainly shows Mr. Kong swinging his knife closer to Officer Jacobs, although not clearly *through* the broken car window. (*See, e.g.*, Mott Body Camera at 8:03-8:07.) As such, it is not clear whether Mr. Kong "violently

lunged his long knife through the open window at [Officer] Jacobs" with any kind of intent to harm, as Defendants claim (Defs.' Br. at 23), or whether Mr. Kong was simply continuing the erratic, unfocused motions he had been making since the start of the encounter. (*See, e.g.*, Tonne Body Camera at 5:36-5:39; Yakovlev Body Camera at 3:10-3:12.) Indeed, in the video, one cannot see the officers reacting to this particular lunge in real time. (*Id.*) Moreover, as a general matter, "merely brandishing or pointing knives is a less significant 'attempt' to use force than would be the case with firearms." *State v. Evans*, 2005 WL 353988, at *6 (Minn. Ct. App. 2005).

This dispute over the video evidence is exacerbated by the fact that, just as in *Wallace*, and contrary to the officers' depositions, in the BCA interviews taken immediately after the shooting none of the four officers mentioned this moment, much less described it as essential to their decision to shoot Mr. Kong. *See Wallace*, 843 F.3d at 768; *see also Henderson v. City of Woodbury*, --- F.3d ---, 2018 WL 6185947, at *5 (8th Cir. Nov. 28, 2018) (holding, in a deadly force case, that a material dispute of fact exists when officers' "uniform deposition testimony" is contradicted by even a single officer's "more or less contemporaneous testimony").

For these reasons, a material dispute of fact exists as to whether Mr. Kong committed a violent felony in the minutes before his death.

      **b. Whether Mr. Kong Posed an Imminent Threat of Death or Grave Bodily Harm to the Surrounding Public When He Fled His Vehicle Holding a Knife**

The next, and more important, reasonableness factor for the Court to consider is whether, at the time of his death, Mr. Kong "pose[d] a significant and immediate threat of

serious injury or death" to the surrounding public. *Capps*, 780 F.3d at 886. In surveying the (admittedly limited) Eighth Circuit case law involving the use of deadly force against a knife-wielding individual, the salient inquiry for this factor appears to be whether the decedent was advancing toward the officers or nearby bystanders at the time of the shooting. *Compare, e.g.*, *Estate of Morgan v. Cook*, 686 F.3d 494, 497 (8th Cir. 2012) (officer reasonably used deadly force where knife-wielding plaintiff, standing only twelve feet from the officer, "stood up and moved toward" the officer) and *Hassan v. City of Minneapolis*, 489 F.3d 914, 919 (8th Cir. 2007) (officer reasonably used deadly force where plaintiff "aggressively brandished a machete and a tire iron while approaching officers in a threatening manner," and "moved toward" civilians on the public street "more than once") *with Ludwig v. Anderson*, 54 F.3d 465, 469, 473-74 (8th Cir. 1995) (officer potentially acted unreasonably when using deadly force against a knife-wielding plaintiff running away from officers, where the nearest bystanders were "across the street" and at least 150 feet away); *see also City of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1775 (2015) (noting, in passing, that officers were justified in using deadly force against a knife-wielding individual who "kept coming at the officers until she was only a few feet away from a cornered [defendant officer]"). Moreover, in considering whether a fleeing person posed a deadly threat to the surrounding public, a reasonable officer is expected to consider "both the person's present and prior conduct," based on the information available to them. *Wallace*, 843 F.3d at 768.

Here, Defendants argue that, at the time of his death, Mr. Kong "clearly posed an immediate threat to the physical safety of the officers and bystanders at the scene," because (a) Mr. Kong "aggressively brandished a long knife in a public parking lot," (b) Mr. Kong

"refused numerous orders to drop his knife even after he was tased," (c) Mr. Kong "used the long knife in a threatening manner by violently lunging and swinging it out the open passenger window at [Officer] Jacobs," (d) "bystanders were in the vicinity," including "in the parking lot, inside and outside the restaurant, on the Frontage Road, and on Highway 13," and (e) Mr. Kong was "sprinting" towards civilians, and Ms. Unterschuetz in particular, when he exited his vehicle. (Defs.' Br. at 27-28.)

By contrast, Plaintiff argues that, far from posing a deadly threat to the officers or the public, in the minutes leading up to his death, Mr. Kong "displayed many of the signs of a mental health crisis described in" the City's CIT policy, did not "attempt[] or threaten[] to commit a crime of violence," and appeared "visibly frightened." (Pl.'s Br. at 28.) Moreover, when he fled his vehicle, Plaintiff contends that Mr. Kong did "not run toward any bystanders" and did "not attempt to turn to face [the] officers." (*Id.* at 29.) Indeed, "[d]uring the entire encounter," Plaintiff emphasizes, Mr. Kong "never exhibited an intent to harm any bystanders or officers." (*Id.*)

Viewing the facts in the light most favorable to Plaintiff, as the Court must at this stage, the Court finds that a genuine dispute of material fact exists as to whether Mr. Kong "pose[d] a significant and immediate threat of serious injury or death" to the surrounding public at the moment Defendants opened fire. *Capps*, 780 F.3d at 886. Most importantly, because the video evidence does not "blatantly contradict" Plaintiff's narrative that Mr. Kong was running *away* from pedestrians and the officers at the time of his death, the Court must credit that version of events. *Scott*, 550 U.S. at 380; *Thompson*, 894 F.3d at 998-99; *see also supra* at 15-16 (describing the relevant video evidence). And to the extent Mr. Kong was

approaching *moving vehicles* on Frontage Road or Highway 13 with a knife in his hand, such as Ms. Untersheutz's vehicle, the Court finds that a reasonable juror might not credit Defendants' fear that Mr. Kong was poised to "either carjack a car or stab somebody," absent the use of deadly force. (Yakovlev BCA Interview at 20; *see also* Hr'g Tr. at 12-13.) This is particularly so in light of Mr. Kong's behavior during the seven minutes prior to his death, which a reasonable juror might interpret as scared and confused, rather than violent and confrontational. (*Accord* Sandoval Dep. at 14.) As the Eighth Circuit noted in *Wallace*, there is a difference between shooting someone merely "fleeing arrest" versus shooting someone "engaging in a 'hostile and intense' physical struggle." *Wallace*, 843 F.3d at 659 (quoting *Parks v. Pomeroy*, 387 F.3d 949, 957-58 (8th Cir. 2004)). Moreover, as the Court detailed above, there is a factual dispute as to whether Mr. Kong assaulted or threatened the police officers prior to his flight, such that the officers would have thought Mr. Kong reasonably likely to "try to stab" someone in his vicinity. (*See* Mott Dep. at 79.)

The limited Eighth Circuit case law concerning the use of deadly force against knife-wielding persons further buttresses this conclusion. Indeed, in the case with the most analogous facts to this one, *Ludwig v. Anderson*, the Eighth Circuit reversed a district court for granting summary judgment to the defendant officers. There, police officers were dispatched to handle an "emotionally disturbed person" (Ludwig) who was camped behind a Wendy's restaurant and concerning civilians in the area. 54 F.3d at 467. Shortly after the officers arrived, the officers attempted to arrest Ludwig for engaging in threatening behavior, which prompted Ludwig to pull out a knife and flee from the officers. *Id.* at 468. The officers chased Ludwig to a nearby street and formed a semicircle around him, all while pointing their

guns at him and ordering him to drop the knife. *Id.* Ludwig did not obey the officers, and continued to "switch[] the knife from hand to hand," "as if [he] might throw the knife." *Id.* During this time, Ludwig "did not lunge at any police officer or run towards any police officer," although one officer later stated otherwise at his deposition. *Id.* at 469. Then, despite knowing that mace might further perturb an "emotionally disturbed person," an officer maced Ludwig, which caused Ludwig to "immediately turn[] and run towards [the street] where [the officer] could see pedestrians." *Id.* The officers then shot and killed Ludwig. *Id.* Although Ludwig was running away from the officers, and the nearest visible bystander was "across the street approximately 150 feet from Ludwig," the officers believed deadly force was needed to "stop Ludwig from possibly attempting to get across the street, which he would then be in contact with other citizens that were in the project, or the apartment building, in that area and he could do harm." *Id.* The present officers "uniformly contend[ed] that deadly force was justified." *Id.* at 473.

On these facts, the District Court found that "it was objectively reasonable for [the officers] to believe that Ludwig posed a serious and immediate danger of physical harm to bystanders in the vicinity." *Id.* at 472. The Eighth Circuit, however, reversed, finding that "material questions of fact remain as to whether Ludwig's actions at the time of the shooting, even if dangerous, threatening, or aggressive, 'posed a threat of serious physical harm.'" *Id.* at 473 (quoting *Garner*, 471 U.S. at 11-12)). In particular, the Eighth Circuit noted that Ludwig was emotionally disturbed, and that the Police Department had a policy which emphasized using lesser force on such persons when they had not committed a dangerous felony. *Id.* at 472. Moreover, the Eighth Circuit added, there were fact questions over how

much of a threat Ludwig posed to bystanders in the area, based on both Ludwig's behavior toward the police and the "number and location" of bystanders. *Id*. at 473-74. In sum, the Eighth Circuit ruled that a reasonable juror could find that the officers "fatally shot Ludwig after St. Paul police suspected him initially of being homeless and emotionally disturbed, and, later, of misdemeanor criminal activity which arguably placed no one in immediate harm." *Id*. at 474.

Likewise here, a reasonable juror could find that, even with a knife, Mr. Kong did not pose a "threat of serious physical harm" to either the pedestrians or officers he was running away from, or the moving vehicles he was running in the general direction of. *Garner*, 471 U.S. at 11-12. In making this determination, a juror might take into account everything Defendants had observed in their seven-minute interaction with Mr. Kong, including the fact that Mr. Kong arguably appeared to be enduring a "mental health crisis," as defined by the City's CIT policy, and accordingly could not fully comprehend the situation at hand. (*See* CIT Policy at 1-2 (detailing the "possible signs of mental health issues or crises," several of which Mr. Kong displayed here).)[15] Indeed, like the St. Paul Police Department policy at issue

---

[15] At their depositions, the officers uniformly contended that, at the time, they believed Mr. Kong was on high on methamphetamines, rather than in the midst of a mental health crisis. (*See supra* at 8-9; *accord* Tonne Dep. at 11, 30-31; Yakovlev Dep. at 22-23, 31-32.) However, when it comes to the CIT policy, this may be a distinction without a difference. As Defendants' own medical expert points out, "acute psychosis due to mental illness and methamphetamine intoxication" "are clinically indistinguishable." (Dr. Hail Ex. Rep. at 13; *accord* Wicklgren Ex. Rep. ¶ 23 (noting that police should respond to "psychotic behaviors" caused by "mental health" issues and/or "drug ingestion" in "the same" manner).) Moreover, an experienced police dispatcher who heard the facts from the 9-1-1 call assumed that this might be a mental health situation. (*See* Kennedy Dep. at 7, 11-12.) Accordingly, a reasonable juror might find the CIT policy's guidance relevant here, as it was in *Ludwig*.

in *Ludwig*, the Burnsville CIT policy cautions officers to use alternatives to deadly force when dealing with emotionally disturbed persons, if possible. *Compare supra* at 6 *with Ludwig*, 54 F.3d at 472. "Although these police department guidelines do not create a constitutional right, they are relevant to the analysis of constitutionally excessive force." *Ludwig*, 54 F.3d at 472 (cleaned up).

This is not to say that Mr. Kong's emotionally disturbed state would *ipse dixit* render Defendants' decision to shoot him unreasonable. *See Frederick*, 873 F.3d at 647 (holding, in the context of using deadly force on a mentally ill person, that "the relevant inquiry is whether [the decedent] posed a threat, not what prompted the threatening conduct"); *accord* CIT Policy at 2 ("Nothing in this policy shall be construed to limit an officer's authority to use reasonable force when interacting with a person in crisis."). Rather, Mr. Kong's mental condition (and accordant inability to understand the situation at hand) is simply one fact among many that may call into question the reasonableness of Defendants' belief that Mr. Kong posed a serious physical threat to bystanders when he fled from his vehicle, such that deadly force (as opposed to a lesser form of force) was necessary. *See Ludwig*, 54 F.3d at 472 (noting that "Ludwig's status as an emotionally disturbed person" did not "entitle[] him to any additional, clearly established constitutional rights," but, rather, would be "relevant to the trial court's determination of objective reasonableness in the substantive portion of this trial").

Other Eighth Circuit cases involving the use of deadly force against knife-wielding persons are readily distinguishable. As the Court noted above, the common thread among cases where the court has ruled for the police at summary judgment is that the decedent moved *toward* officers or pedestrians at the time of death, usually in a threatening manner. Consider

35

*Hassan v. City of Minneapolis*, the case arguably next closest to this one, after *Ludwig*. There, the police shot and killed a mentally ill man brandishing a machete and tire iron following a mid-afternoon 11-minute confrontation in "the middle of [a residential] street" and then in a "shopping mall parking lot." 489 F.3d at 917. During this confrontation, the man repeatedly "ran at" and slashed at officers and "moved toward citizens more than once." *Id*. at 917-19. The man also made comments like "that ain't enough," after the officers hit him with a taser. *Id*. at 917. The officers finally shot the man, following five failed taser hits, when he "moved toward the officers" while "making slashing motions with his machete" and "hit[ting] the trunk of the squad car [which the officers were standing next to] with his machete." *Id*. at 918. The officers in that case had also undergone CIT training. *Id*. at 917-18. On these facts, both the District Court and the Eighth Circuit found that the officers' use of deadly force was not unreasonable because, even if the man was mentally ill, he "posed a significant and immediate threat of death or serious physical injury to the officers and to the public." *Id*. at 919.

*Schneider v. City of Minneapolis*, No. 03-cv-3510 (JMR/FLN), 2006 WL 1851128 (D. Minn. June 30, 2006), is also instructive. There, the police entered an apartment on a domestic disturbance call and encountered a "highly disturbed" woman "yell[ing] something about Satan" and charging toward them with a long knife. *Id*. at *1. The officers quickly exited the apartment and held the door shut, as the woman "repeatedly attempted to open the door." *Id*. After the woman stopped pushing on the door, the officers re-entered the apartment. *Id*. at *2. Once inside, the officers again encountered the woman in her bedroom, where she was holding a knife and calling the police "Nazis and pigs." *Id*. at *3. The woman ignored the officers' commands that she drop the knife, and instead "advanced to the bedroom doorway,"

just feet from the officers. *Id*. Two officers simultaneously shot and killed her. *Id*. On these facts, the Court granted summary judgment to the defendant officers, finding that, even though the woman was mentally ill, it was "objectively reasonable" to use deadly force on "an epithet-screaming woman advancing on them with a knife." *Id*. at *6-7.

Plaintiff's behavior in this case was certainly frightening and unpredictable, like the decedents in *Hassan* and *Schneider*. However, when one views the video evidence in the light most favorable to Plaintiff, Mr. Kong posed a far less imminent threat of "death or serious bodily injury" to bystanders (or the officers) when Defendants opened fire on him. Not only was Mr. Kong moving away from the officers and pedestrians at the time of his death, but his (arguably) confused and frantic behavior during the seven-minute lead-up to the shooting falls far closer to the emotionally distraught behavior in *Ludwig* than the menacing behavior displayed in *Hassan* and *Schneider*.

For these reasons, a genuine dispute of material fact also exists as to whether Mr. Kong "pose[d] a significant and immediate threat of serious injury or death" to the surrounding public at the time of the shooting. *Capps*, 780 F.3d at 886.[16]

---

[16]     Although the parties discussed other cases involving mentally ill knife-wielding plaintiffs in their briefs, those cases are not helpful to determining whether the officers' use of deadly force was objectively reasonable under the Fourth Amendment. *Kisela v. Hughes*, 138 S. Ct. 1148 (2018) discussed only the "clearly established" prong of the qualified immunity analysis, and hence provides no guidance on the reasonableness of an officer's use of deadly force. Additionally, *Frederick v. Motsinger*, cited repeatedly by Defendants, involved the reasonableness of using a *taser* on a mentally disturbed person wielding a knife in public, which is not at issue here. 873 F.3d at 646. Indeed, in *Frederick*, the plaintiff conceded that the officers were justified in shooting and killing the decedent (after the taser proved ineffective) because the undisputed video evidence showed the decedent "charg[ing] toward" the police officer "with her knife in a stabbing position." *Id*. at 645. Suffice it to say, that was not the case here.

### b.  Whether Defendants Violated Clearly Established Law

#### 1.  The Law

Of course, even if material disputes of fact preclude the Court from deeming Defendants' use of deadly force objectively reasonable as a matter of law, the Court must still find in Defendants' favor if the constitutional right Defendants allegedly violated was not "clearly established" as of March 17, 2016. *Neal*, 895 F.3d at 582. This requirement insures that law enforcement officers have "fair warning" that their treatment of a person may be unconstitutional at the time of the incident. *Id.* (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). In recent years, moreover, the Supreme Court has emphasized, repeatedly, that courts must not "define clearly established law at a high level of generality." *Kisela*, 138 S. Ct. at 1152; *White v. Pauly*, 137 S. Ct. 548, 552 (2017); *Sheehan*, 135 S. Ct. at 1776. In other words, because "the general rules [surrounding the use of deadly force] set forth in *Garner* and *Graham* do not by themselves create clearly established law outside an obvious case," courts should look for "existing precedent" that "squarely governs the specific facts at issue." *Kisela*, 138 S. Ct. at 1153 (cleaned up). However, "it is not necessary . . . that the very action in question has previously been held unlawful," so long as precedent evinces "a fair and clear warning of what the Constitution requires." *Thompson*, 894 F.3d at 999 (cleaned up).

#### 2.  Analysis

The Court understands that this is a demanding standard.[17] However, viewing the facts in the light most favorable to Plaintiff, Eighth Circuit law provided Defendants "a fair and

---

[17]     Indeed, the standard is so demanding that, in recent years, jurists and academics from across the ideological spectrum have called the historical and legal underpinnings of

clear warning of what the Constitution require[d]" when confronted with this situation. *Thompson*, 894 F.3d at 999.

The "squarely governing" precedent is *Ludwig v. Anderson*, which the Court described at some length above. *See supra* at 32-34. That case, which has been cited over 475 times since 1995, established that, without more, it is not constitutionally reasonable to use deadly force against a fleeing, emotionally disturbed person armed with a knife, if that person had not previously attacked anybody, if that person is moving away from the officers and other nearby pedestrians, and if that person does not pose an imminent threat of death or grave bodily harm to others. If anything, this case may have been clearer cut than *Ludwig*, in that Ludwig was running toward a nearby "apartment building" of bystanders, while holding a knife, whereas Mr. Kong was only running toward *moving vehicles* on a busy highway. *See Ludwig*, 54 F.3d at 469. Suffice it to say, a knife poses a far greater threat to a pedestrian than a driver. *Cf. Reyes v. Bridgewater*, 362 Fed. App'x 403, 407 (5th Cir. 2010) (denying qualified immunity and noting that "[t]he immediacy of the risk posed by a man armed with a kitchen knife at his side is far less than that of a man armed with a gun" because "a gun can kill instantaneously at a distance" whereas a man with a knife "would have had to first either advance toward [another] or at least raise the knife before he could inflict any harm").

---

this "clearly established" inquiry into question. *See, e.g.*, *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1871-72 (2017) (Thomas, J., concurring); *Zadeh v. Robinson*, 902 F.3d 483, 498-500 (5th Cir. 2018) (Willett, J., concurring); William Baude, *Is Qualified Immunity Unlawful?*, 106 Cal. L. Rev. 45 (2018); Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 Notre Dame L. Rev. 1797 (2018).

Although Defendants point out various factual differences between this case and *Ludwig*, these differences are either irrelevant or would require the Court to view the facts in the light most favorable to Defendant. (*See* Defs.' Reply Br. at 2 (stating that, unlike Ludwig, Mr. Kong "sprinted *toward* people with a knife," "repeatedly swung . .. his knife against the windows *toward* the Officers," and "lunged his knife out the broken passenger window *toward* [Officer] Jacobs").) As the Court explained above, a reasonable juror could find that Mr. Kong did not assault or threaten the officers before his flight, and that Mr. Kong did not pose an imminent threat of death or grave bodily harm to the surrounding public when he did flee. *See Tolan*, 572 U.S. at 657 ("[C]ourts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions.").

All told, because the factual differences between *Ludwig* and this case do not "leap from the page," the Court declines to grant Defendants qualified immunity at this juncture. *Cf. Kisela*, 138 S. Ct. at 1154 (finding that law was not clearly established when the "differences between" the purportedly governing precedent "and the case before us leap from the page") (citing *Sheehan*, 135 S. Ct. at 1776).

* * * *

The Court acknowledges that Mr. Kong did not respond to Defendants' repeated commands to drop his knife, and that he fled his car with a weapon in hand. *See Wealot*, 865 F.3d at 1125 (noting that whether a person "was actively resisting arrest or attempting to evade arrest by flight" is relevant to the objective reasonableness analysis). The Court also acknowledges that Defendants were "forced to make [a] split-second judgment" in "circumstances that [were] tense, uncertain, and rapidly evolving." *Church*, 898 F.3d at 833.

However, given both the Eighth Circuit precedent and the significant disputes of material fact detailed above, the Court cannot resolve this Fourth Amendment claim as a matter of law. The facts surrounding Mr. Kong's death are in dispute, as is evident from the video evidence. It should be for a jury to decide whether the officers acted reasonably under the circumstances.

For these reasons, the Court denies Defendants' summary judgment motion with respect to Plaintiff's Fourth Amendment claim.

### 3. Deliberate Indifference to Mr. Kong's Medical Needs Under the Fourteenth Amendment

#### 1. The Law

The Due Process Clause of the Fourteenth Amendment prohibits state and local government officials from depriving "any person" of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV. This Clause "generally confer[s] no affirmative right to governmental aid." *DeShaney v. Winnebago Cty. Dep't Soc. Servs.*, 489 U.S. 189, 196 (1989). However, "when the State takes a person into its custody and holds him there against his will," the Clause "impos[es] . . . a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 199-200; *accord Estelle v. Gamble*, 429 U.S. 97 (1976) (holding, under the Eighth Amendment, that the State must provide prisoners with adequate medical care). This is so because, "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state

action set by the Eighth Amendment and the Due Process Clause." *DeShaney*, 489 U.S. at 200.

In line with these general principles, the Eighth Circuit has held that an "arrestee," in the police's custody, "has a right to be free from deliberately indifferent denials of emergency medical care." *Bailey v. Feltmann*, 810 F.3d 589, 593 (8th Cir. 2016).[18] "'Custody' in this context must be something more than an individual's reasonable belief that he is not free to leave, as is the case under the Fourth Amendment." *Gladden v. Richbourg*, 759 F.3d 960, 965 (8th Cir. 2014). "Rather, custody is effected for purposes of the Fourteenth Amendment only when the state 'so restrains an individual's liberty that it renders him unable to care for himself.'" *Id.* (quoting *DeShaney*, 489 U.S. at 200)). This is a "high standard." *Id.*; *accord Dodd v. Jones*, 623 F.3d 563, 567 (8th Cir. 2010).

If a person is in the police's custody, that person may state a Due Process claim if he "demonstrate[s] that he suffered an objectively serious medical need, and that the [officers] had actual knowledges of those needs but deliberately disregarded them." *Carpenter*, 686 F.3d at 650. "This showing requires a mental state akin to criminal recklessness." *Barton v. Taber*, 820 F.3d 958, 965 (8th Cir. 2016). For instance, the Eighth Circuit recently found that

---

[18]     Admittedly, in this circuit, "it is an open question whether the standard of the Fourth or the Fourteenth Amendment applies to medical care claims of *arrestees*." *Ryan v. Armstrong*, 850 F.3d 419, 425 n.2 (8th Cir. 2017) (emphasis added). However, because Plaintiff did not invoke the Fourth Amendment in their briefing or complaint, the Court proceeds on the understanding that the Fourteenth Amendment, and its accordant "custody" standard, governs this claim. *See Carpenter v. Gage*, 686 F.3d 644, 650 (8th Cir. 2012) ("Carpenter cites authorities applying due process analysis, and he does not invoke the Fourth Amendment, so we consider his argument on that basis."); *see also Bailey*, 810 F.3d at 593 (declining to resolve this question even when the plaintiff did invoke the Fourth Amendment).

two officers were deliberately indifferent to a seriously ill pretrial detainee's medical needs "when they allowed him to scream, howl, and bang against his cell door for eight hours without attempting to talk to him or seek medical intervention." *Ryan*, 850 F.3d at 426.

## 2. Analysis

Here, Plaintiff argues that Defendants took Mr. Kong into custody when Officers Jacobs and Tonne blocked his car in. (Pl.'s Br. at 32-34 (citing *U.S. v. Turley*, 161 F.3d 513, 514-15 (8th Cir. 1998).)[19] Then, Plaintiff continues, Defendants deliberately ignored Mr. Kong's obvious need for medical attention when they broke his car window and tasered him, instead of waiting for the medics that Officer Jacobs had summoned (and who arrived approximately six minutes after the shooting, along with additional police officers). (*Id*. at 34-37.) "Such actions," Plaintiff contends, "caused Mr. Kong to exit his vehicle, where he was no longer amenable to medical evaluation, observation, and ultimately treatment." (*Id*. at 36.)

Defendants, by contrast, argue that Mr. Kong was not taken into custody until his death. (Defs.' Br. at 37-39) And even if Mr. Kong was in custody during the seven-minute encounter, Defendants assert, there is no case law, much less "clearly established" case law, that would have put officers on notice that they had a constitutional duty to provide medical care to someone in Mr. Kong's position. (*Id*. at 39.)

The Court finds Defendants' actions in the lead-up to Mr. Kong's death troubling, to say the least. However, the Court declines to consider the merits of Plaintiff's Due Process

---

[19] In their briefs, both parties use the phrase "seized" rather than "taken into custody." However, because this claim is being analyzed under the Fourteenth Amendment, the Court will use the latter phrase.

claim because, even viewing the facts in the light most favorable to Plaintiff, qualified immunity plainly protects the officers from suit. *See Pearson*, 555 U.S. at 237 (encouraging courts to decide qualified immunity defenses on the "clearly established "prong" when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right"). The Court cannot find precedent, from this Circuit or any other, that would have informed the officers that Mr. Kong was in their custody for Fourteenth Amendment purposes, such that they had an affirmative duty to provide him medical care. *See Kisela*, 138 S. Ct. at 1153 (instructing courts to look for "existing precedent" that "squarely governs the specific facts at issue"). Indeed, in its research, the Court cannot find any medical indifference case with facts similar to this one.

In every case involving deliberate indifference to an arrestee's medical needs that the Court has found (or which Plaintiff has cited in their brief), the plaintiff was physically placed under arrest and/or held in a jail or squad car before the deliberate indifference claim arose. *See, e.g.*, *Barton*, 820 F.3d at 964-65; *Bailey*, 810 F.3d at 593-94; *Carpenter*, 686 F.3d at 650-51; *accord DeShaney*, 489 U.S. at 200 (suggesting that the right to medical care would only arise during "incarceration, institutionalization, or other similar restraint on personal liberty"). Here, although Officer Jacobs technically placed Mr. Kong under arrest early on in the encounter, *see supra* at 9, Mr. Kong remained in his car until seconds before his death, and never submitted to Defendants' physical authority. Therefore, even if Defendants could see that Mr. Kong was in need of emergency medical assistance, the law did not clearly state that the officers had a duty to provide him that assistance until after he was "restrained," and "unable to care for himself." *DeShaney*, 489 U.S. at 200; *cf. Carpenter*, 686 F.3d at 651

("Before the deputies could consider responding to Carpenter's medical needs, they had to subdue him and secure the premises.").

This situation is somewhat analogous to *Dodd v. Jones*. There, police officers responded to a car accident and found an injured driver (who had been driving drunk) lying in the middle of the road. *See* 623 F.3d at 565. The officers did not move the driver for fear of further injuring him. *Id*. Instead, the officers began investigating the accident scene. *Id*. Six minutes later, though, another drunk driver came along and ran over the injured driver. *Id.* at 566. After this happened, the officers arrested both drivers for drunk driving. *Id*. at 565-66. The injured driver brought a Due Process medical indifference claim against the officers, arguing that he was in their custody from the moment the officers arrived and that, by not attempting to block traffic or set road flares, the officers were deliberately indifferent to his medical needs. *Id*. However, the Eighth Circuit found it "doubt[ful]" that the officers "took [the driver] into custody and held him against his will so as to trigger the corresponding duty described in *DeShaney*." *Id*. at 567. "The absence of a clearly established duty for the officers to protect [the injured driver] under these circumstances," the Eighth Circuit concluded, "is sufficient grounds to affirm the district court's grant of summary judgment in a qualified immunity case." *Id*.

Defendants certainly exercised more force to hold Mr. Kong "against his will" than the officers in *Dodd*, and arguably should have paid more careful attention to Mr. Kong's mental condition while they had him surrounded. *Id*. However, because the officers never actually took Mr. Kong into custody during their seven-minute encounter with him, the same "absence of a clearly established duty" applies here. *Id*.

The only contrary authorities Plaintiff cites for the proposition that Defendants should have known that Mr. Kong was in their custody for Fourteenth Amendment purposes are Fourth Amendment "seizure" cases. *See, e.g.*, *Turley*, 161 F.3d at 515 (holding that "blocking" a person's "truck with the squad car resulted in a Fourth Amendment seizure"). However, as the Court noted above, the Eighth Circuit has made clear that "custody" under the Fourteenth Amendment is a much higher bar than a "seizure" under the Fourth Amendment, for the policy reasons set forth in *DeShaney*. *See Gladden*, 759 F.3d at 965. Because this case law is inapposite, the law did not offer Defendants "a fair and clear warning of what the Constitution require[d]" in this situation. *Thompson*, 894 F.3d at 999.

For these reasons, the Court grants Defendants qualified immunity with respect to Plaintiff's Fourteenth Amendment claim.

### B. Negligence

#### 1. The Law

"The basic elements of a negligence claim are (1) a duty; (2) a breach of that duty; (3) that the breach of duty be the proximate cause of plaintiff's injury; and (4) that plaintiff did in fact suffer an injury." *Hudson v. Snyder Body, Inc.*, 326 N.W.2d 149, 157 (Minn. 1982). However, "[t]he doctrine of official immunity protects from personal liability a public official charged with duties that call for the exercise of judgment or discretion unless the official is guilty of a willful or malicious wrong." *Rico v. State*, 472 N.W.2d 100, 106-07 (Minn. 1991). Official immunity under Minnesota law is not the same as qualified immunity under Section 1983. *See Elwood v. Rice Cty.*, 423 N.W.2d 671, 677 (Minn. 1988). Under Minnesota law, "whether official immunity applies turns on: (1) the conduct at issue; (2) whether the conduct

is discretionary or ministerial . . . ; and (3) if discretionary, whether the conduct was willful or malicious." *Vassallo ex rel. Brown v. Majeski*, 842 N.W.2d 456, 462 (Minn. 2014).

Where it is agreed that the conduct at issue was discretionary, as is the case here, only the third consideration applies. (*See* Pl.'s Br. at 42 (conceding that the Police Department policy in question is discretionary).) "In determining whether an official has committed a malicious wrong," courts must consider "whether the official has intentionally committed an act that he or she had reason to believe is prohibited." *State by Beaulieu v. City of Mounds View*, 518 N.W.2d 567, 571 (Minn. 1994). This is "less of a subjective inquiry into malice," and "more of an objective inquiry into the legal reasonableness of an official's actions." *Id.*; *accord Hayek v. City of St. Paul*, 488 F.3d 1049, 1056 (8th Cir. 2007). In other words, because "malice" in this context "does not refer to the question of whether [an] official was acting with animus," "an allegation of actual malice is not necessary." *Gleason v. Metro. Transit Operations*, 563 N.W.2d 309, 317 & n.3 (Minn. Ct. App. 1997). As such, "[w]hether an officer acted maliciously is usually a question of fact for the jury." *Kelly v. City of Minneapolis*, 598 N.W.2d 657, 664 n.5 (Minn. 1999); *see, e.g.*, *Anderson v. City of Hopkins*, 805 F. Supp. 2d 712, 724-25 (D. Minn. 2011); *Mattson v. Becker Cty.*, No. 07-cv-1788 (ADM/RLE), 2008 WL 3582781, at *10 (D. Minn. Aug. 12, 2008); *Gleason*, 563 N.W.2d at 319; *Soucek v. Banham*, 503 N.W.2d 153, 161 (Minn. Ct. App. 1993); *Maras v. City of Brainerd*, 502 N.W.2d 69, 78 (Minn. Ct. App. 1993).

If a court determines that an official is not entitled to official immunity, "vicarious official immunity will not protect [a municipality that is also named as a defendant]." *Brown*

*v. City of Bloomington*, 706 N.W.2d 519, 524 (Minn. Ct. App. 2005) (citing *Wiederholt v. City of Minneapolis*, 581 N.W.2d 312, 316 (Minn. 1998)).

### 2. Analysis

Plaintiff's negligence claim here centers around the Burnsville Police Department's CIT Policy. (*See supra* at 6 (hereinafter "the Policy").) Put simply, Plaintiff contends that (1) Defendants had a duty to adhere to the Policy, given Mr. Kong's plainly distressed behavior; (2) Defendants breached that duty by breaking Mr. Kong's windows and escalating the situation, in direct contravention of the "de-escalation" tactics delineated in the Policy; and (3) Defendants' actions proximately caused Mr. Kong's death. (*See* Pl.'s Br. at 42-43.)

In response, Defendants only raise an official immunity defense. Because both parties agree that the Policy is discretionary, Defendants primarily contend that the evidence definitively shows that they did not "intentionally commit[] an act that [they] had reason to believe [was] prohibited" by the Policy. *City of Mounds View*, 518 N.W.2d at 571. More specifically, Defendants argue that they did not know Mr. Kong had any mental health issues at the time of the shooting, and that the Policy accordingly did not apply. (*See* Defs.' Br. at 41.) Defendants also argue that, even if the Policy did apply, they properly exercised their discretion in an emergency situation, and did not knowingly violate the Policy. (*Id.* at 41-42; Defs.' Reply Br. at 5-6.)

Plaintiff, in turn, contends that, (1) the record shows that Defendants "believed that Mr. Kong was experiencing a crisis caused by such drug intoxication," (2) "[d]espite such knowledge, Defendant[s] disregarded the provisions of the Policy, which clearly applied to Mr. Kong," and (3) "[t]he contrast between the guidance set forth in the Policy and what

actually happened could not be starker, and supports a finding that Defendants proceeded in the unreasonable manner they did because they willfully disregarded department policy." (Pl.'s Br. at 42-43.)

Viewing the evidence in the light most favorable to Plaintiff, the Court finds that material questions of fact exist as to whether Defendants knowingly, or "maliciously," acted in contravention of the Policy. First, even though the officers uniformly contended at their depositions that they did not believe Mr. Kong was experiencing a mental health crisis, a reasonable juror could infer from the video evidence and the Policy's plain text (as well as other circumstantial evidence, like Officer Jacobs's decision to call for a medic and the dispatcher's response to that call), that the Policy applied in this situation. *See supra* note 15.

Second, a reasonable juror could find that Defendants' actions contravened the Policy. For example, the Policy lists ten things officers should do when confronted with someone in a mental health crisis besides using force, such as "requesting available backup officers and specialized resources," and "secur[ing] the scene and clear[ing] the immediate area." (*See* CIT Policy at 2.) A reasonable juror might find that Defendants acted contrary to the Policy by breaking Mr. Kong's windows and using a taser on him six minutes into the encounter, even though Mr. Kong was "contained," in Officer Jacobs's words (Jacobs Body Camera at 5:45-5:55), and additional officers were available from neighboring police departments to help clear the scene of bystanders. *See supra* at 17 and note 12. A reasonable juror might also conclude that Defendants' guiding assumption that "the situation was not safe so long as Mr. Kong was in his car," *supra* note 7 (quoting Mott Dep. at 48-49), ran afoul the Policy's directive that "passively monitoring the situation may be the most reasonable response to a

mental health crisis." (CIT Policy at 3.) This factual dispute is further sharpened by the parties' expert witnesses. (*Compare* Wickelgren Ex. Rep. (opining that Defendants acted in accordance with the Policy and reasonable law enforcement techniques) *with* Blaricom Ex. Rep. (opining that Defendants acted in contravention of the Policy and reasonable law enforcement techniques).)

Third, a reasonable juror could find that Defendants had "reason to believe" that their actions contravened the Policy because they were all familiar with the Policy at the time of the incident. *City of Mounds View*, 518 N.W.2d at 571. Indeed, Officer Mott had received extensive training on the Policy, and was a member of the Department's "CIT Team." *See supra* at 6; *cf. Maras*, 502 N.W.2d at 78 (denying official immunity at summary judgment and noting that an officer's "intentional" decision to shoot a person who he deemed a threat, along with the officer's "aware[ness] of state and city policy regarding the use of deadly force," were "sufficient to let the jury decide whether his actions constituted a willful or malicious wrong").

The Eighth Circuit decision, *Hayek v. City of St. Paul*, offers a useful comparison to this case. There, police officers received a call that a mentally disturbed young man was having a mental breakdown in his mother's apartment. *See* 488 F.3d at 1052. Police officers entered the apartment and found the man, alone, holding a "Samurai sword in his lap." *Id*. at 1053. The officers began talking to the man, telling him "they were there to help him" and "were his friends." *Id*. After further conversation, the officers convinced the man to put his weapon down and come out into the hallway. *Id*. However, when the officers attempted to arrest the man, the man resisted and ran back into the apartment. *Id*. After the officers

50

unsuccessfully attempted to use a canine to bring the man down, the man grabbed his sword and began stabbing an officer. *Id*. The other officers then shot and killed the young man. *Id*.

Plaintiff there brought a negligence claim, and argued that the officers failed to follow their duties under a "Policy on Emotionally Disturbed Persons" similar to the Policy at issue here. *Id*. at 1056. The Eighth Circuit rejected this argument at summary judgment, and found that the officers were entitled to official immunity. "The record clearly shows the officers adequately complied with this policy," the Eighth Court held, especially because the officers "attempted to establish a friendly rapport with [the man] and [first] restrain [him]," before resorting to "deadly force after [the man] stabbed [an officer] and continued to pursue [the officer]." *Id*.

By contrast, the record here does not "clearly show" that Defendants "adequately complied" with the Policy, up to and including their use of deadly force on the fleeing Mr. Kong. *Id*. For instance, in comparison to the officers' initially "friendly" approach in *Hayek*, there is a fact question here as to whether Defendants knowingly contravened the Policy's "de-escalation" guidance during the few minutes between arriving on the scene and breaking Mr. Kong's car windows. *Cf. Hall v. Ramsey Cty.*, 2016 WL 3659261, at *5 (Minn. Ct. App. July 11, 2016) (concluding that a detox facility nurse's "actions were not willful or malicious because they were justified under the detox center's procedures").

For these reasons, the Court denies Defendants' summary judgment motion with respect to Plaintiff's negligence claim.[20]

## III.    CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [Doc. No. 43] is **GRANTED IN PART AND DENIED IN PART**.

A jury trial is set for Monday April 15, 2019 at 10:00 AM in Courtroom 7B (STP). The Court will issue a final pretrial order forthwith.

Dated:  December 14, 2018                          s/Susan Richard Nelson
                                                   SUSAN RICHARD NELSON
                                                   United States District Judge

---

[20]    Because the Court concludes that the individual officer Defendants are not entitled to official immunity on Plaintiff's negligence claim, the City of Burnsville is not entitled to vicarious official immunity either. *See Brown*, 706 N.W.2d at 524.